UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SUSAN ROUSSEL                                         CIVIL ACTION

VERSUS                                               NO. 10-75

MICHAEL J. ASTRUE, COMMISSIONER                      SECTION "S" (2)
OF SOCIAL SECURITY ADMINISTRATION

## ORDER ON MOTION, AND FINDINGS AND RECOMMENDATION

Plaintiff, Susan Roussel, appearing pro se, seeks judicial review pursuant to

Section 405(g) of the Social Security Act (the "Act") of the final decision of the

Commissioner of the Social Security Administration (the "Commissioner"), denying

plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act. 42

U.S.C. §§ 405(g), 423. This matter was referred to a United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

I.      PROCEDURAL HISTORY

Roussel filed an application for DIB on May 23, 2008, alleging disability since

September 12, 2005, due to heart problems, triple bypass surgery, high blood pressure,

anxiety and depression. (Tr. 86-88, 92-93, 102). After her application was denied, she

requested a hearing before an Administrative Law Judge ("ALJ"), which was held on

May 13, 2009. (Tr. 26-55). On August 14, 2009, the ALJ issued a decision denying

plaintiff's application. (Tr. 15-25). After the Appeals Council denied review on

December 9, 2009, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 1-5).

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff, who is appearing pro se, does not identify any specific legal error in her memorandum of facts and law.  Accordingly, the court will review the entire record to determine whether substantial evidence supports the ALJ's findings.

Roussel has unnecessarily attached to her memorandum, Record Doc. No. 13, copies of documents that are already in the administrative record.  Record Doc. No. 11. In addition, she has attached to her memorandum four exhibits that are not in the record. Therefore, I treat her memorandum and these exhibits as a motion to submit new evidence.  IT IS ORDERED that the motion is DENIED for the reasons stated below.

III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.   Based on her earnings records, Roussel had sufficient quarters of coverage to remain insured through December 31, 2007.  Thus, she must establish disability on or before that date to be entitled to a period of disability and DIB.

2.   She did not engage in substantial gainful activity from her alleged onset date of September 12, 2005 through December 31, 2007, the date when she was last insured.

3.      Through the date last insured, Roussel had severe impairments, consisting of hypertension with dizziness and lightheadedness, a history of myocardial infarction with triple bypass graft surgery, obesity and fibromyalgia.

4.      Through the date last insured, plaintiff did not have any impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Specifically, she does not meet Listing 4.01 for ischemic heart disease or Listing 12.06 for anxiety related disorders.

5.      Through the date last insured, Roussel had the residual functional capacity to perform light work, provided that she can follow simple repetitive instructions and cannot work in environments with temperature extremes or hazards such as heights or moving machinery.

6.      Her medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of her symptoms are not supported by the medical evidence and are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

7.      The conclusory opinion of plaintiff's treating physician, Dr. Rima El-Abassi, that plaintiff cannot participate in any employment is not accorded controlling weight.

8.      Through the date last insured, Roussel was not capable of performing her past relevant work as a sales office secretary and sales office manager, which were skilled jobs that required the ability to carry out complex instructions.

9.      She acquired administrative skills from her past relevant work as a sales office secretary, which are transferable to other occupations with jobs that exist in significant numbers in the national economy, including lobby attendant and ticket taker, cashier, and receptionist and information clerk.

3

10.     Roussel was not under a disability at any time from the alleged onset date of September 12, 2005 through the date last insured of December 31, 2007.

(Tr. 15, 17-24).

IV.     <u>ANALYSIS</u>

A.     <u>Standards of Review</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005); <u>Waters v. Barnhart</u>, 276 F.3d 716, 716 (5th Cir. 2002); <u>Loza v. Apfel</u>, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Perez</u>, 415 F.3d at 461; <u>Loza</u>, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  <u>Id.</u>

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2009).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1]  The five-step

---

[1] The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions

---

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez, 64 F.3d at 174.

B.     Factual Background

Plaintiff, who was represented by an attorney at the hearing, testified that she was born in 1956 and is married with two children, both over the age of 18.  She stated that she lives with her husband in a house that they own.  She said she is five feet six inches tall and weighs 217 pounds.  She testified that her usual weight is between 135 and 145 pounds and that she has gained weight since taking Paxil.[2]  (Tr. 31-32).  She stated that she is right-handed.  She said she completed the twelfth grade and has no problems with reading, writing or basic math.  She testified that she personally has no source of income. (Tr. 32).

Roussel stated that she began working at Days Inn as a receptionist, then became a sales secretary and worked her way up to sales manager during 15 years at the company.  She testified that she stopped working in May 2002 because her husband had a good job working overseas, and she began having difficulties with a new manager at the hotel.  She said the new management created a difficult situation for all the

---

[2]Paxil (generic name: paroxetine hydrochloride) is a psychotropic drug indicated for the treatment of major depressive disorder, panic disorder and generalized anxiety disorder.  Physicians' Desk Reference 1587, 1588 (64th ed. 2010).

employees and that she was one of the last to leave the hotel.  She stated that she quit because her husband had a good job and that she has not worked since then.

Plaintiff testified that she had a heart attack and triple bypass surgery in September 2005, which is when she became disabled.  (Tr. 33).  She said she occasionally gets chest pains, but whenever she talks to her doctors about it, they tell her it is caused by stress, not by her heart condition.

Roussel stated that she is being treated with medication for depression and anxiety. She said her doctor had just taken her off Paxil and she is trying Cymbalta.[3]  She testified that she cries "at the drop of a pen just sometimes for stupid things" or for no reason. She stated that her life has not been the same since she evacuated for Hurricane Katrina, then had a heart attack and lost her parents.  She said she could have as many as two panic attacks in a day, but every day is different.  (Tr. 34).  She explained that, when she has a panic attack, she cannot breathe, feels like she is not getting enough oxygen, her heart races and sometimes her tongue goes numb.  (Tr. 34-35).  She said she was rushed to the hospital once because she thought she was dying, but it was a panic attack.  She stated that the frequency of her attacks varies, that she could have two to four attacks in

---

[3]Cymbalta (generic name: duloxetine hydrochloride) is indicated for the acute and maintenance treatment of major depressive disorder and for the acute treatment of generalized anxiety disorder.  Id. at 1873.

8

a day and that she has them at least weekly and usually daily.  She said an attack lasts for a few minutes up to 15 minutes.

Plaintiff testified that she is being treated for fibromyalgia.  She said she originally went to the doctor because her elbow hurt, and that her condition has been getting worse. She stated that both elbows and knees hurt and that she wakes up during the night in pain and with numbness in her hands.  (Tr. 35).  She said that she sat so long at the doctor's office the previous Monday[4] that, when she got home, she took her new medicine and went straight to bed.  (Tr. 35-36).  She testified that she lies in bed and cries herself to sleep because of the pain in her legs.

Roussel stated that she is going to be tested for sleep apnea.  She said her doctors are doing EEG's and an ultrasound because they are concerned she might have a blockage.  She testified that her medicine was changed because the medication that she started in January had not helped and that she had tried to get an earlier appointment, but the earliest appointment she could get was on the previous Monday.  She said she does not have any side effects from her medications, other than weight gain.

Plaintiff stated that sometimes she sees double images and feels as if her eyes are crossed, but her husband and daughter have looked at her during those times and her eyes

---

[4]The hearing was held on Wednesday, May 13, 2009.

9

are not crossed.  She said the episodes pass on their own.  (Tr. 36).  She testified that she

told the doctor the previous Monday that she sometimes gets dizzy and feels like she will

faint, but she does not faint and the dizziness passes.  She stated that her doctor was

going to test the arteries in her neck for blockage because of this.

Roussel testified that she tosses and turns all night.  She stated that she wakes up

because it feels like there is no circulation in either arm, her fingers get cramps and she

gets a "Charlie horse" in the arch of her right foot.  She said she had been taking Elavil,[5]

but her doctor had just discontinued it because it might be causing these problems.  She

stated that the doctor said she might have restless leg syndrome and that he started her

on Ambien,[6] which was helping her to sleep.

Plaintiff stated that she is able to take care of her personal needs, but that she

neglects herself at times.  She said she gets into "moods" two or three times per month

when she does not care and she will not bathe for three days.  (Tr. 37).

---

[5]Elavil is a brand name for amitriptyline hydrochloride.  PubMed Health (National Institutes of Health, National Center for Biotechnology Information, U.S. National Library of Medicine), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666 (last visited Dec. 8, 2010).  Amitriptyline hydrochloride "belongs to a group of drugs called tricyclic antidepressants and is used to treat depression."  PDRhealth, http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=ami1155.html&contentName= Amitriptyline%20hydrochloride&contentId=54 (last visited Dec. 8, 2010).

[6]Ambien (generic name: zolpidem tartrate) is used for the short-term treatment of insomnia characterized by difficulties with sleep initiation.  Physicians' Desk Reference at 2921.

Roussel testified that she does housework, but her family helps with it.  She said she tries to keep busy and keep her mind occupied, but sometimes she neglects the housework when she is in one of her moods.  She testified that her husband and her son have done all the yard work since her heart attack.  She stated that she drives, but has avoided it recently because of her double vision episodes.  She testified that she had an episode once while she was driving and waiting for a red light.  She said that she pulled the car over, her son took over the driving and the episode of double vision passed.  She stated that she tries not to drive long distances.

Plaintiff said she has no hobbies and has never attended social organizations. (Tr. 38).  She testified that she used to enjoy gardening, crocheting and sewing, but she does none of these activities now because her hands cannot take it.  (Tr. 38-39).

Roussel stated that she is not sure how she responds to stress.  She said she tries to keep it to herself, but she can explode and scream.  She testified that she is more forgetful lately.  She gave as examples forgetting that she has something cooking, so that she burns the food if she leaves the kitchen, and forgetting to add the soap or close the lid of the washing machine to do laundry.  She said she had lost her car three times in the Walmart parking lot because she could not remember where she parked.  She stated that her ability to concentrate depends on how much pain she is feeling and that she can concentrate only if she is not in pain.  (Tr. 39).

11

Plaintiff testified that her hips hurt if she stands for very long, that she feels better when sitting and that she feels stiff when she stands up after sitting.  (Tr. 39-40).  She said she gets stiff after only ten minutes of sitting.  She stated that she can stand at the sink to wash dishes, but she gets dizzy or light-headed.  She could not say how long she can stand without getting dizzy because every day is different.  She testified that sometimes she gets dizzy when she goes to bed at night, but the dizziness passes.

Roussel said she could walk for about one-half block before she gets short of breath.  (Tr. 40).  She testified that she can lift her 14-pound grandchild, but she feels it in her wrists and elbows.  (Tr. 40-41).  She stated that she usually naps for two to three hours daily, which rejuvenates her and makes her feel better.

Plaintiff said she drives less than once a week because her husband and her two children are around and can drive her to the grocery store.  (Tr. 41).  She estimated that she drives six or seven times per month to shop or go to a doctor.  (Tr. 41-42).  She stated that she does not visit anyone.

Roussel testified that, on a typical day, she gets up about 8:00 a.m., fixes something to eat, washes dishes, takes her medicine and washes one or two batches of laundry.  She said that, if it is a good day and she is not hurting too much, she sits on the sofa and watches television for about an hour, then goes out into the back yard with her dogs for a few minutes, sits in her rocker, uses the computer for a while and takes care

of her pet birds, including cleaning their cages.  (Tr. 42-43).  She stated that she usually does not eat lunch, watches television instead, and folds clothes, sweeps or mops.  She testified that it now takes her longer to do housework because her hands cramp when she holds a broom or vacuum cleaner.

Plaintiff stated that she perspires excessively, even when sitting still.  She said she cooks dinner for her family.  (Tr. 43).  She testified that, in the evenings, she watches television with the family, or goes outside to swing or to feed ducks in the canal behind her house.  She said she occasionally goes out to eat, but she has been having trouble with diarrhea during the past month.  (Tr. 44-45).  She did not think this was a medication side effect because she had been taking the same medication since January, and the doctor had not said anything when she told him about it the previous Monday.

Roussel testified that she had not seen a doctor since January, but that her neurologist, whom she just started seeing, wants to see her again in two months.  She said she sees her cardiologist every six months (Tr. 45-46), although she used to go more frequently and had frequent tests.  Plaintiff stated that she had been seeing Dr. Ricky at Community Health Center, but he could not understand what was causing her to have a feeling like someone zapped her with electricity when she walked, so he referred her to a neurologist.  She said she was diagnosed with fibromyalgia in January, after she had blood work done.  She testified that she has not gone to the emergency room.

13

Plaintiff clarified that, although she gets stiff after ten minutes and feels like a 90-year-old when she stands up, it does not bother her to sit. (Tr. 46). She said she could sit for an hour before her back starts to bother her. She believes that she cannot work because her body has not been the same since her heart attack, she suffers anxiety and panic attacks, and she has pain in her legs at night that makes it difficult to sleep. She said she would have to call in sick all the time if she had a job. She stated that her husband is not working. (Tr. 47).

Roussel explained that she was the sales manager at the hotel for only the last two years that she worked. She said she started as a secretary in the sales office, which had many of the same duties as the sales manager, but it involved more typing and paperwork than the managerial job. She stated that, during the work day as a secretary, she would sit, stand and walk. She testified that she showed the hotel banquet rooms and sleeping quarters to potential group clients and made sure the housekeepers were doing their job and the banquet room was clean when a group was coming in. She said that she sat more than she walked. She clarified that she never worked as a hotel receptionist. (Tr. 48-50).

C.    <u>Vocational Expert Testimony</u>

A vocational expert, Kelly Roberts, testified at the hearing. She stated that plaintiff's past relevant work as a secretary is classified as sedentary, skilled work with

a "specific vocational preparation" ("SVP") level[7] of six, although Roussel probably did a little more walking than in a typical secretarial job.  (Tr. 50-51).  Roberts said that plaintiff's past job as a hotel sales manager is considered light, skilled work with an SVP of eight.[8]  (Tr. 51).

The ALJ posed a hypothetical of an individual between the ages of 48 and 52 with plaintiff's education and work history who could perform light work, lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, no standing or walking for more than six hours in an eight-hour day, sitting for six hours in an eight-hour day, with the need to avoid concentrated exposure to temperature extremes and hazards of unprotected heights and dangerous, moving machinery.  The vocational expert testified that such a person could perform both of plaintiff's past

---

[7]"Specific vocational preparation" is defined in the Dictionary of Occupational Titles as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.". . .

> The DOT lists a specific vocational preparation (SVP) time for each described occupation.  Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

Bray v. Comm'r, 554 F.3d 1219, 1230 n.4 (9th Cir. 2009) (quoting Dictionary of Occupational Titles App. C, at 1009 (4th ed. 1991); SSR 00-4p, 2000 WL 1898704, at *3).

[8]Skilled work with an SVP of six requires a learning period of "[o]ver 1 year up to and including 2 years," while work with an SVP of eight requires "[o]ver 4 years up to and including 10 years." Dictionary of Occupational Titles App. C, ¶ II, U.S. Dep't of Labor, Ofc. of Admin. Law Judges Law Library, http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (last visited Dec. 8, 2010).

relevant jobs.  When the ALJ modified the hypothetical to restrict the individual to work that entailed simple, detailed instructions, and not complex instructions, Roberts stated that the restriction would eliminate the sales manager job.  (Tr. 51).  She testified that it was difficult to say whether the sales secretary position would be eliminated because every employer is different in how complex the job details are for a particular secretary.

The ALJ then assumed that the skilled secretarial position would be eliminated, but that the hypothetical claimant could still perform semi-skilled, secretarial work.  The vocational expert testified that administrative skills, such as typing, shorthand, dictation, recording, proofreading and various clerical functions acquired as a secretary would be transferable to semi-skilled employment that is available in Louisiana and the national economy, such as a receptionist and information clerk and a general office clerk.  Roberts stated that there are both sedentary and light jobs available in those two categories in which a person of that age range could use the transferable skills.  (Tr. 52-53).

The ALJ further modified the hypothetical so that the individual is limited to a job with simple repetitive instructions, with the same light exertional level and temperature and hazard restrictions as before.  Roberts testified that unskilled positions are available in the state and national economies for such a person, including lobby attendant and ticket taker, cashier, and receptionist and information clerk.  She stated that no jobs

would be available for a person who needs to lie down for more than the standard break times or who has at least two unscheduled absences per month.  (Tr. 54-55).

Although given the opportunity, plaintiff's attorney did not cross-examine the vocational expert.  (Tr. 55).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 18, 20-22).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The relevant time period is from the alleged onset date through the date last insured.

Plaintiff identifies no legal error in her pro se memorandum.  Accordingly, the court reviews the entire record to determine whether substantial evidence supports the ALJ's finding that Roussel was not disabled during the relevant time period.

Roussel applied for DIB, alleging an onset date of September 12, 2005.  She was insured for DIB only through December 31, 2007.  "Thus, to prove that she is entitled to disability benefits, [plaintiff] must not only prove that she is disabled, but that she became disabled prior to the expiration of her insured status."  Anthony v. Sullivan, 954

F.2d 289, 295 (5th Cir. 1992) (citing 42 U.S.C. § 423(a), (c)); <u>accord</u> <u>Hernandez v.</u>

<u>Astrue</u>, 278 F. App'x 333, 338 (5th Cir. 2008); 20 C.F.R. §§ 404.315, 404.320,

404.131(a) (emphasis added).  A claimant who becomes disabled after the expiration of

her insured status is not entitled to DIB.  <u>Cook v. Astrue</u>, No. 7:07-CV-0170-BF, 2008

WL 4454044, at *6 (N.D. Tex. Oct. 2, 2008) (citing 42 U.S.C. §§ 416(i)(3), 423c;

<u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1080 (5th Cir. 1981)).

Roussel therefore must show that she was unable "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment

which . . . has lasted or can be expected to last for a continuous period of not less than

twelve months," 42 U.S.C. §§ 423(d)(1)(A), <u>as of</u> December 31, 2007, the date that she

was last insured for DIB.  Much of plaintiff's memorandum in this court focuses on

medical records and diagnoses dated after December 31, 2007, some of which were

reviewed and considered by the ALJ and/or the Appeals Council.  However, any records

dated after December 31, 2007 are relevant in this case only to the extent they might

establish that Roussel was disabled <u>as of</u> that date.

2.     <u>Plaintiff's motion to submit new evidence is denied.</u>

Roussel attached to her memorandum copies of several documents that are in the

administrative record.  These exhibits are unnecessary because the entire administrative

record has been filed with the court.  Record Doc. No. 11.

18

Plaintiff also attached to her memorandum four unverified documents, which are not in the administrative record and thus were not considered by the Commissioner: (1) an undated article or advertisement from an unknown source entitled "Disasters and Cardiac Events," by Douglas Mendoza, M.D., F.A.C.C.,[9] Record Doc. No. 13-1 at p. 5; (2) the results of an electroencephalogram from the Medical Center of Louisiana at New Orleans ("MCLNO") dated May 27, 2009, Record Doc. No. 13-1 at p. 12; (3) a laboratory test result from MCLNO dated June 29, 2009, Record Doc. No. 13-1 at p. 6; and (4) a referral slip from the LSU Health System Rheumatology and Immunology Clinic dated December 14, 2009, Record Doc. No. 13-1 at p. 7. I therefore treat plaintiff's memorandum in part as a motion to submit new evidence.

It is well established that this court may not issue factual findings on new medical evidence and may review such evidence only to determine if a remand to the Commissioner is appropriate. Spence v. Barnhart, 159 F. App'x 593, 596 (5th Cir. 2005); Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995); Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989). Accordingly, I must determine whether this case should be remanded so the Commissioner may consider the allegedly new and material evidence.

---

[9]Fellow Of The American College Of Cardiologists.

19

The court may remand for consideration of new evidence only upon a showing that the evidence is new <u>and</u> material, <u>and</u> that good cause exists for plaintiff's failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g); <u>Joubert v. Astrue</u>, 287 F. App'x 380, 383 (5th Cir. 2008) (citing <u>Ripley</u>, 67 F.3d at 555); <u>Garson v. Barnhart</u>, 162 F. App'x 301, 303 (5th Cir. 2006) (citing <u>Leggett v. Chater</u>, 67 F.3d 558, 567 (5th Cir. 1995)).

"Evidence which is merely cumulative of that already in the administrative record is <u>not</u> 'new' evidence that would support a remand under [42 U.S.C.] § 405(g)."  <u>Wilson v. Astrue</u>, No. H-08-01392, 2009 WL 2341803, at *4 (S.D. Tex. July 27, 2009) (citing <u>Pierre v. Sullivan</u>, 884 F.2d 799, 803 (5th Cir. 1989); <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1058 (5th Cir. 1987)) (emphasis added); <u>accord</u> <u>Perkins v. Shalala</u>, No. 93-01940, 1994 WL 523788, at *3 (5th Cir. Sept. 12, 1994); <u>Martin v. Barnhart</u>, No. 02-3574, 2004 WL 1661207, at *3 (E.D. La. July 23, 2004) (Vance, J.) (citing <u>Pierre</u>, 884 F.2d at 803).

New evidence must be material to be the basis for a remand.  The "materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied."  <u>Castillo v. Barnhart</u>, 325 F.3d 550, 551-52 (5th Cir. 2003) (citing <u>Ripley</u>, 67 F.3d at 555); <u>accord</u> <u>Joubert</u>, 287 F. App'x at 383.  This requirement means that the new evidence cannot merely concern a subsequently acquired

disability or the deterioration of a condition that was not previously disabling.  Id.; Garson, 162 F. App'x at 303.

In addition, "[f]or new evidence to be material, there must exist the reasonable possibility that it would have changed the outcome of the [Commissioner's] determination."  Hunter v. Astrue, 283 F. App'x 261, 262 (5th Cir. 2008) (quotations omitted) (citing Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981)); accord Jones v. Astrue, 228 F. App'x 403, 406 (5th Cir. 2008) (citing 28 U.S.C. § 405(g)).

The four documents submitted by Roussel are not new and material, as defined by the Fifth Circuit, for the following reasons.  First, the newspaper article or advertisement by Dr. Mendoza is not material.  Dr. Mendoza has not treated or evaluated plaintiff. Even if he had, the article merely describes briefly and generally how "acute stress associated with major disasters can influence risk factors for coronary heart disease." Record Doc. No. 13-1 at p. 5.  Roussel's coronary artery disease is well documented in the medical records that the ALJ considered.  There is no reasonable possibility that Dr. Mendoza's generic article would have changed the outcome of the Commissioner's decision.

Second, the new medical records attached to plaintiff's memorandum are dated May 27, June 29 and December 14, 2009.  These records therefore reflect the results of

21

tests run and diagnoses made from 18 to 24 months after plaintiff's last insured date of December 31, 2007. These reports are immaterial because they do not relate to the period for which benefits were denied, which extended from September 12, 2005 to December 31, 2007 only. Sanchez v. Barnhart, 75 F. App'x 268, 270 (5th Cir. 2003) (citing Shave v. Apfel, 238 F.3d 592, 597 (5th Cir. 2001)); Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994).

Third, plaintiff has failed to demonstrate a reasonable possibility that these three medical records would change the outcome of the Commissioner's decision. Roussel asserts in her memorandum that she has the symptoms and diagnoses of a prior heart attack, coronary artery disease, depression, panic attacks and fibromyalgia. All of these symptoms and diagnoses are reflected in the medical records that the ALJ and the Appeals Council considered. Based on that evidence, the ALJ found that Roussel had severe impairments, consisting of hypertension with dizziness and lightheadedness, a history of myocardial infarction with triple bypass graft surgery, obesity and fibromyalgia. Therefore, the new records that plaintiff has submitted are merely cumulative and there is no reasonable possibility that they would change the outcome of the Commissioner's decision. Lenoir v. Apfel, 234 F.3d 29, 2000 WL 1568184, at *1 (5th Cir. Sept. 14, 2000) (citing Haywood, 888 F.2d at 1471; Pierre, 884 F.2d at 803).

Plaintiff argues in her memorandum that, by October 24, 2008, "[m]y symptoms are growing and more and more things are hurting."  F.R.D. 13 at p. 4.  To the extent that the new evidence she has submitted might show any increased symptoms or newly diagnosed conditions that developed after December 31, 2007, these records demonstrate at best a deterioration of a previously non-disabling condition.  There is no reasonable possibility that the new evidence would have affected the ALJ's determination that Roussel was not disabled.  "Remand [cannot] be based on new evidence of a subsequent deterioration of what was previously correctly held to be a non-disability condition."  Lenoir, 2000 WL 1568184, at *1.  If plaintiff has evidence that her condition has deteriorated to the point that she became disabled after December 31, 2007, she can use the evidence to apply directly to the Social Security Administration for benefits for the appropriate period.  Shave, 238 F.3d at 597; Falco, 27 F.3d at 164 n.20.

Accordingly, Roussel's motion to submit new evidence is DENIED.

3.     Substantial evidence supports the ALJ's finding that plaintiff is not disabled.

At the fourth step of the sequential evaluation, the ALJ found that, through the date last insured, Roussel had the residual functional capacity to perform light work, with the limitations that she can follow simple repetitive instructions and cannot work in environments with temperature extremes or hazards such as heights or moving

23

machinery.  The ALJ found at the fifth step that Roussel could perform other jobs that exist in significant numbers in the national economy, including lobby attendant and ticket taker, cashier, and receptionist and information clerk.

Substantial evidence supports these findings.  As the ALJ noted, after Roussel recovered from her heart attack and coronary artery bypass surgery in September 2005, objective test results were essentially normal each time she was tested and her doctors continued to assess her coronary artery disease as stable.  (Tr. 177, 181-84, 192-93, 216, 218-20, 241, 245, 310, 327, 372, 374-75).  Her treating cardiologist, Gary D. Menszer, M.D., released her from his care with medications to control her cholesterol and blood pressure on June 11, 2007, and advised her to return in one year.  (Tr. 214).

Plaintiff's symptoms following her recovery from heart surgery were primarily attributed to depression and panic attacks, which improved when she was compliant with her medications, initially Lexapro[10] and then Paxil.[11]  (Tr. 309-12).  Roussel was never referred to, nor received treatment from, a mental health specialist.

---

[10]Lexapro (generic name: escitalopram oxalate) is a selective serotonin reuptake inhibitor indicated for the acute and maintenance treatment of major depressive disorder and the acute treatment of generalized anxiety disorder.  Physicians' Desk Reference 1161 (64th ed. 2010).

[11]Paxil (generic name: paroxetine hydrochloride) is a psychotropic drug indicated for the treatment of major depressive disorder, panic disorder and generalized anxiety disorder.  Id. at 1587, 1588.

A medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling.  Bolton v. Apfel, 237 F.3d 632, 2000 WL 1701816, at *1 (5th Cir. Nov. 3, 2000); Leblanc v. Chater, 83 F.3d 419, 1996 WL 197501, at *3 (5th Cir. 1996); Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987); Bridges v. Massanari, No. 00-2639, 2002 WL 202221, at *3 (E.D. La. Feb. 7, 2002) (Vance, J.).  A claimant's failure to seek treatment or to comply with prescribed treatment or medication is a relevant factor to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations, including the symptoms of depression.  Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001); Austin v. Apfel, 205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999); Anthony v. Sullivan, 954 F.2d 289,  295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

As to her mental impairments, substantial evidence supports the ALJ's findings that Roussel was only mildly restricted in her activities of daily living and social functioning; was moderately restricted in concentration, persistence and pace; and had experienced no episodes of decompensation in a work-like setting.  The ALJ's residual functional capacity assessment and his hypothetical questions to the vocational expert

accounted for plaintiff's moderate restriction in concentration, persistence and pace by limiting her to work in which she can follow simple repetitive instructions.

As to her diagnosis of fibromyalgia, plaintiff was seen by a neurologist, Dr. El-Abassi, on January 12, 2009, more than 12 months after her last insured date. Roussel complained of blurred or double vision during the past week and a six-month history of bilateral elbow pain, thigh pain radiating to her knees and an electric-shock type of pain all over her body. Physical examination was normal. Dr. El-Abassi noted that plaintiff's blood test results were "remarkable" for levels of several elements, including cholesterol, although he did not explain what these results indicated. Dr. El-Abassi diagnosed fibromyalgia and started plaintiff on amitriptyline and Neurontin.[12] (Tr. 368-69, report dated February 2, 2009 of examination on January 12, 2009).

To the extent that Roussel continued to experience "nonspecific musculoskeletal problems" on March 24, 2009, for which the neurology clinic was "considering fibromyalgia as one of her diagnoses," a cardiologist at the MCLNO continued her on gabapentin and amitriptyline. (Tr. 372).

_____

[12]Neurontin (generic name: gabapentin) is used to treat post-herpetic (shingles) nerve pain and to treat partial seizures in patients with epilepsy. Physicians' Desk Reference 2590 (56th ed. 2002); accord PDRhealth,
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=neu1289.html&contentName=Neurontin&contentId=522 (last visited Dec. 8, 2010).

On May 11, 2009, Dr. El-Abassi wrote a note on a prescription slip, which states in its entirety that Roussel "has fibromyalgia and chronic depression which makes [sic] her unable to participate in any employment." Although the record contains prescriptions for Ambien and Tramadol dated May 11, 2009 and signed by Dr. El-Abassi (Tr. 377), and plaintiff testified that she saw a doctor on May 11, 2009, there are no treatment notes in the record for that date.

The ALJ accepted Dr. El-Abassi's diagnosis of fibromyalgia as one of Roussel's severe impairments. However, the mere diagnosis of an impairment does not establish disability. Martin v. Chater, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing Anderson v. Sullivan, 925 F.2d 220, 222 (7th Cir. 1991)); accord Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991); Arroyo v. Secretary of Health & Human Servs., 932 F.2d 82, 87-88 (1st Cir. 1991); Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983). To establish disability, plaintiff "must show that she was so functionally impaired by her [diagnosed impairment] that she was precluded from engaging in any substantial gainful activity." Id. (emphasis added); accord Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir. 1992). In the instant case, Roussel must prove that she was disabled as of December 31, 2007.

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." Newton, 209 F.3d at 455. However,

> the ALJ has sole responsibility for determining a claimant's disability status. The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. The treating physician's opinions are not conclusive. The opinions may be assigned little or no weight when good cause is shown. Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

Id. at 455-56.

The ALJ did not accord controlling weight to Dr. El-Abassi's opinion that Roussel is incapable of employment. The ALJ explained that the opinion is conclusory and lacking in explanation or supporting evidence; appears to rely in part on an assessment of chronic depression, an impairment for which Dr. El-Abassi did not treat Roussel; and the diagnosis of fibromyalgia appears to be largely and uncritically based on plaintiff's subjective report of symptoms and limitations, which the ALJ found were not credible. (Tr. 22).

Furthermore, it is well established that a physician's statement that a patient is disabled does not mean that the patient is disabled for purposes of the Act, because that

28

is a determination that may be made only by the Commissioner.  Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Tamez v. Sullivan, 888 F.2d 334, 336 n.1 (5th Cir. 1989).

> [S]ome opinions by physicians are not medical opinions, and as such have no "special significance" in the ALJ's determination.  Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work."  These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner." . . .  The doctor's opinion [that plaintiff could not work] was not a medical opinion within the meaning of the regulation.

Frank, 326 F.3d at 620 (quoting 20 C.F.R. § 404.1527(e), (1) & (e)(3)); see also Social Security Ruling 96-5p, 1996 WL 374183, at *2 ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").

The ALJ explained his reasons for according no weight to Dr. El-Abassi's opinion that Roussel cannot work due to fibromyalgia and chronic depression, including the ALJ's finding elsewhere in his opinion that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms are not supported by the medical evidence and are not credible.  The ALJ is bound to explain his reasons for rejecting a claimant's subjective complaints, but "he is not required to 'follow formalistic rules in his articulation.'"  Hernandez v. Astrue, 278 F. App'x 333, 339 (5th Cir. 2008) (quoting Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)).  The ALJ has the

responsibility to evaluate the credibility of witnesses, <u>Masterson v. Barnhart</u>, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" <u>Spruill v. Astrue</u>, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting <u>Falco</u>, 27 F.3d at 164). Thus, the ALJ's credibility evaluation is entitled to <u>considerable deference</u> by this court. <u>McKnight v. Astrue</u>, 340 F. App'x 176, 181 (5th Cir. 2009); <u>Bedford v. Astrue</u>, 236 F. App'x 957, 962 (5th Cir. 2007). The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required. <u>Falco</u>, 27 F.3d at 163-64; <u>Godbolt v. Apfel</u>, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999) (Vance, J.); <u>accord James J. Flanagan Stevedores, Inc. v. Gallagher</u>, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing <u>Falco</u>, 27 F.3d at 163). Here, the ALJ adequately explained that he found Roussel's subjective complaints not entirely credible to the extent alleged because they were not supported by the entirety of the medical records or by her activities of daily living. (Tr. 22).

Finally, once the ALJ determines plaintiff's residual functional capacity, he may rely on vocational expert testimony to reach conclusions about the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. 20 C.F.R. § 404.1566(d), (e); <u>Leggett</u>, 67 F.3d at 565; <u>Vaughan v. Shalala</u>, 58 F.3d 129, 132 (5th Cir. 1995); <u>Villa</u>, 895 F.2d at 1022. The ALJ in this case "expressly and rightly relied on the testimony of . . . the vocational expert, in reaching this

30

conclusion [that jobs exist that plaintiff is capable of performing.  Plaintiff] offered no contrary evidence and thus did not satisfy [her] burden to prove that [she] could not perform the kinds of jobs identified by" the vocational expert.  Masterson v. Barnhart, 309 F.3d 267, 273 (5th Cir. 2002).

## CONCLUSION

The ALJ had good cause to give no weight to the nonmedical opinion of Dr. El-Abassi that plaintiff could not work.  Substantial evidence supports the ALJ's findings concerning plaintiff's credibility and residual functional capacity and that she is capable of performing jobs that exist in significant numbers in the national and state economies.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

31

<u>United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[13]

Roussel is advised that, if she files written objections to this report and recommendation, she does not need to re-submit any documents that she already submitted to the Commissioner at the administrative level or to this court.

New Orleans, Louisiana, this ____10th____ day of December, 2010.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[13]<u>Douglass</u> referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

32